**UNITED STATES of America**

v.

**Richard D. BARNETT (001), Virgil R. Drake (002).**

**No. CRIM. 97–60033.**

United States District Court, W.D. Louisiana, Lafayette–Opelousas Division.

Sept. 17, 1997.

See also, 986 F.Supp. 405, 1997 WL 694916.

sity jurisdiction exists as well." *T.N.T. Marine Service, Inc.,* 702 F.2d at 587 (interpreting Rule 9(h)).

Terry Hart, Akin Gump, Hauer & Feld, Dallas, TX, Kraig T. Strenge, Lafayette, LA, for Richard D. Barnett.

C. Michael Hill, Laborde & Neuner, Lafayette, LA, Patrick J. Hanna, Rabalais Hanna & Hays, Lafayette, LA, for Virgil R. Drake.

Howard Parker, U.S. Attorney's Office, Lafayette, LA, for U.S.

### RULING ON GOVERNMENT'S MOTIONS FOR PRETRIAL DETENTION

METHVIN, United States Magistrate Judge.

#### Summary of Findings

The government seeks pretrial detention of both defendants under the Bail Reform Act of 1984 ("the Act"). The Act requires the court to consider a number of factors in deciding whether there are conditions of release which "will reasonably assure the appearance of the [defendants] and the safety of any other person and the community." 18 U.S.C. § 3142(e).

Following a detention hearing on August 27, 1997, I ordered Drake released on a $500,000 secured bond, with stringent conditions of release. A stay of the release order was entered pending review by the district

judge. The issue of Barnett's release was taken under advisement on September 2, 1997.

This ruling supplements the oral reasons given for Drake's release, and sets forth findings and conclusions as to Barnett's bail eligibility pending trial.

Supporting the government's motion for detention of defendants is the nature of the crime charged (attempted murder for hire), and the weight of the evidence.

Supporting the defendants' request for pretrial release are their clean records, close family ties, employment histories, length of residence in the community, past conduct, financial resources, community ties, and absence of any history of alcohol or drug abuse. Most important, both defendants have close, qualified family members willing to post their homes and other real or personal property as security for a bail bond.

The final factor, the nature and seriousness of the danger to the purported targets of the hit, weighs in favor of release in Drake's case, and in favor of detention in Barnett's case.

After carefully considering the evidence presented at four hearings, I conclude that there are conditions of release which will reasonably assure the appearance of *both* defendants and the safety of the community.

The court has the authority to require defendants and their sureties to execute not only an "Appearance Bond," but an "Appearance and Compliance Bond." Such a bond provides that the failure to appear or to comply with any condition of release, including the condition that the defendant not commit any offense while on release, will result in forfeiture of the bond. Compliance with these conditions can be assured by requiring close family members of each defendant to post their homes or other property as security for $500,000 bonds.

In Barnett's case, the bond securities will include his mother's mobile home, and his sister and brother-in-law's family home and 2 1/2 acres of property. In addition, all of Barnett's financial assets will be posted as security for the bond.

In Drake's case, the bond securities will include Drake's family home, an additional tract of rural property, and his son's home in Baton Rouge.

### 1. The Charges

The defendants are charged in a two-count indictment as follows:

| CHARGE | MAXIMUM SENTENCE |
| --- | --- |
| **COUNT I.**<br>Conspiracy to travel and cause another to travel in interstate commerce with the intent that murder for hire be committed. 18 U.S.C. § 371 and § 1958 | Up to five years in prison, or a fine of $250,000, or both; plus a term of supervised release of up to 3 years; plus a $100 special assessment. |
| **COUNT II**<br>Interstate travel and use of interstate facilities with intent that murder for hire be committed. 18 U.S.C. § 1958. | **MAXIMUM SENTENCE**<br>Up to ten years in prison, or a fine of $250,000, or both; plus a supervised release term of up to 3 years; plus a $100 special assessment. |

The government contends that on July 10, 1997, while in Belize City, Belize, Barnett met with a person he believed to be a hit man to negotiate the murder of Ernest Parker and Logan Nichols.[1] In fact, the "hit man" was a confidential informant (CI) who recorded the conversation and turned it over to the FBI. The FBI recorded all of the meetings and telephone calls thereafter between the CI, Barnett, and co-defendant Virgil R. Drake, who allegedly helped Barnett facilitate the scheme in the United States.

The government contends that on July 11 or 12,[2] Barnett gave the CI a piece of paper containing Drake's telephone number and instructions to speak in code. On July 12, Barnett returned to Houston from Belize. On July 17, the Belize CI received a package from Barnett containing $2,000 in expense money. Barnett called the CI several days

---

[1]. The government's contentions are outlined in the affidavit of FBI Agent Jean B. St. Pierre, Jr. attached to the criminal complaint dated August 4, and the text of the indictment which was returned on August 15. FBI Agent Garland Jean Batiste, who posed as the second hit man in the United States, provided additional information at the detention hearings.

[2]. The affidavit attached to the complaint says July 11; the indictment says July 12.

later to confirm his receipt of the money. On July 28 the CI left a telephone message at Drake's residence, advising him that the hit men would be arriving on July 30 or 31. On July 31 the CI traveled to Lafayette, La. and was joined by an FBI undercover agent posing as a second hit man.

On August 1, Drake met the CI and the undercover agent (hereinafter referred to as "the CIs" for sake of brevity) at a Lafayette hotel and gave them two packages containing the addresses and other information regarding Parker and Nichols. Later that morning, Barnett telephoned the CIs and set up a meeting in Orange, Texas for that afternoon. At the meeting, Barnett paid the CIs $5,500 in cash for the murders of Parker and Nichols. At approximately 6:00 p.m. that day, Drake drove the CIs by Parker's house in Lafayette.

Soon thereafter Barnett and Drake were arrested.

### 2. *Procedural Background*

#### A. *Barnett*

Barnett was arrested in Houston on August 5, 1997 on a criminal complaint. He waived a detention hearing in Texas and was transported by the Marshal to this district for further proceedings. The duty magistrate, Magistrate Judge Pamela A. Tynes, scheduled a bail hearing and a preliminary examination for August 18. Prior to that date, however, the indictment was returned and the case was assigned to District Judge Tucker L. Melançon and myself for all future proceedings.

Barnett appeared before me for an initial appearance, arraignment, and bail determination on the indictment on August 21, 1997. The government moved for pretrial detention on grounds that Barnett was both a danger to persons in the community, and a flight risk. A detention hearing was held over the course of three days: August 21, August 27, and September 2, 1997. Following the first detention hearing, I listened *in camera* to certain audiotapes the government obtained during its investigation of the case.

At the conclusion of the third detention hearing I took the bail determination under advisement.

#### B. *Drake*

Drake was arrested at work without incident on August 5, 1997, pursuant to the criminal complaint. A detention hearing was held on August 12 before Magistrate Judge Tynes. The government called no witnesses. It simply requested the court to take judicial notice of the affidavit of FBI Agent Jean St. Pierre, Jr. supporting the criminal complaint, and of the report recommending detention by Pretrial Services Officer Marc Coleman.

Drake called two witnesses to testify: Mr. Coleman and FBI Agent St. Pierre. At the conclusion of the hearing, Judge Tynes remarked that, "This case is particularly troubling in the fact that there is no apparent or detected motive apparent from the face of the record at this point." [3] Judge Tynes noted that Drake's past history was nonviolent and noncriminal, but she concluded that the violent nature of the crime charged, the weight of the evidence, and the nature and seriousness of the danger posed by his release weighed in favor of detention.

Judge Tynes stated, "If further evidence should come out that is new that hasn't been brought to my attention, the statute provides the defendant can file a Motion for Reconsideration of this bail determination." [4] An order of detention was entered upon the following written findings:

I find that the credible testimony and information submitted at the hearing establishes by clear and convincing evidence that the safety of certain persons in the community cannot be reasonably assured by conditions of release. Factors in support include: (1) The charged offense is a serious crime of violence precipitated by an unknown motive; (2) the weight of the evidence is substantial and compelling; (3) Although defendant's past history and conduct seems to indicate a non-violent, noncriminal nature, his involvement in the charged offense entirely negates and su-

---

3. Tr. 8/12/97 hearing, p. 16, lines 15–17.

4. Tr. 8/12/97, p. 17–18.

persedes his past behavior; (4) The nature and seriousness of the danger posed by his release is established by the nature of the crime charged, "murder for hire", and the weight of evidence noted above.

(Order of Detention Pending Trial, 8/12/97).

The grand jury returned the instant indictment on August 15, three days after Magistrate Judge Tynes ordered Drake detained on the complaint. On August 22, Drake came before me for an initial appearance and arraignment on the indictment. The government objected to the court holding another detention hearing, arguing that Magistrate Judge Tynes' order should remain in effect unless Drake moved for reconsideration on the basis of new evidence, or filed an appeal under 18 U.S.C. § 3145(c). The objection was overruled because the indictment was a new charging document and it differed in material respects from the preceding complaint. Consequently, I found Drake was entitled to a new bail determination. Upon the government's request, however, the detention hearing was continued to August 27.

At Drake's detention hearing on August 27, the government called two witnesses: FBI Agent Garland Jean–Batiste, who had worked undercover as the second "hit man"; and Midge Parker, wife of Ernest Parker, one of the purported targets of the murder for hire scheme. The defense called Probation Officer Marc D. Coleman; defendant's wife, Carole Drake; and defendant's supervisor at the Louisiana Department of Natural Resources, John Edward Caldwell, Jr.

After considering the evidence presented, I concluded that there were conditions of release which would reasonably assure the appearance of Drake and the safety of any other person and the community. I ordered Drake released on the following conditions:

1. Defendant and his sureties (his wife, son, and daughter-in-law) shall execute an Appearance and Compliance Bond in the amount of $500,000, secured by the full unencumbered value of the home owned by Drake and his wife (approximately $50,000); by the full unencumbered value of the home owned by Drake's son and daughter-in-law in Baton Rouge (approximately $5,000); and by the full unencumbered value of real property owned by the defendant in Beauregard Parish (approximately $25,000);

2. The Appearance and Compliance Bond will provide that forfeiture of the posted securities will occur if Drake fails to appear as ordered, or fails to comply with a material condition of release as set forth in the Order Setting Conditions of Release (AO Form 199A);

3. Defendant and his wife, as third party custodian, shall sign an "Order Setting Conditions of Release" (AO 199A), the terms of which will be incorporated into the Appearance and Compliance Bond. The specific conditions of release to be imposed in the "Order Setting Conditions of Release" are as follows:

 a. Defendant will be placed into the third-party custody of his wife, Carole Drake, who will be responsible for supervising the defendant in accordance with all conditions of his release, using every effort to assure his appearance, and notifying the court immediately in the event he violates any release condition or disappears;

 b. The defendant shall maintain or actively seek employment;

 c. The defendant shall restrict his travel to Lafayette Parish;

 d. The defendant shall avoid all contact with the following individuals or their families: Ernest Parker, Logan Nichols, Richard Barnett, the FBI agents involved, and the confidential source;

 e. The defendant shall report on a regular basis to the Probation Office as directed;

 f. The defendant shall comply with a curfew from 6:00 p.m. to 7:00 a.m., which may be electronically monitored by the Probation Office.

 g. The defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapon;

h. The defendant shall refrain from excessive use of alcohol, and any use or unlawful possession of a narcotic drug and other controlled substances defined in 21 U.S.C. § 802 unless prescribed by a licensed medical practitioner;

i. The defendant shall obtain no passport and shall surrender any current passport to the Clerk of Court.

A stay order was entered to allow the government to seek review by the district judge pursuant to 18 U.S.C. § 3145(a).

### 3. The Bail Reform Act of 1984

#### A. History and Purpose

■ The Bail Reform Act of 1984 prescribes a comprehensive procedure for release or detention of those charged with federal crimes. The Act revised the former statute, the Bail Reform Act of 1966, which focused mainly on assuring the appearance of the defendant at judicial proceedings.[5] The 1984 Act made two key changes in the law: 1) it prohibited the practice of using inordinately high financial conditions to detain defendants; and 2) authorized courts to consider the danger a defendant may pose to the community or certain individuals. *United States v. Orta*, 760 F.2d 887, 890 (8th Cir. 1985).

Congress was concerned about the problem of crime committed by persons on pretrial release, a concern which the former Act failed to address.[6] Congress revised the Act to give courts authority to "make release decisions that give the appropriate recognition to the danger a person may pose to others if released." [7]

■ The pretrial detention provisions of the Act did not signal, however, a Congressional intent to incarcerate wholesale the category of accused persons awaiting trial. *Id.* Rather, Congress was concerned about a small group of individuals who could not be motivated to comply with release conditions,

no matter how stringent. The Senate Report states:

> There is a small but identifiable group of particularly dangerous defendants as to whom neither the imposton [sic] of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons. It is with respect to this limited group of offenders that the courts must be given the powers to deny release pending trial.

> The decision to provide for pretrial detention is in no way a derogation of the importance of the defendant's interest in remaining at liberty prior to trial. * * * It is anticipated that [pretrial release] will continue to be appropriate for the majority of Federal defendants.

S.Rep. No. 225, 98th Cong., 1st Sess. 6–7, reprinted in 1984 U.S.C.C.A.N. 3189–90 (footnotes omitted).

The Supreme Court rejected a constitutional challenge to the Act in *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). The Court held that the Act did not violate either the Fifth Amendment's guarantee of substantive due process, or the Eighth Amendment's proscription against excessive bail. The Court noted two safeguards in the Act limiting pretrial detention on grounds of danger to the community: (1) there are only six circumstances in which pretrial detention can be ordered on grounds of danger to the community; and (2) the government has a heightened burden of proof—"clear and convincing evidence" as opposed to a preponderance of the evidence. *Id.* at 750, 107 S.Ct. at 2103.

The Court's decision relied heavily upon the narrowness of the Act's effect upon defendants awaiting trial:

> In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception. We hold that the provisions for pretrial detention in

---

5. *See* S. Rep. No. 225, 98th Cong., 2nd Sess. 3, reprinted in 1984 U.S.C.C.A.N. 3182, 3185–86.

6. S.Rep. No. 225, 98th Cong., 1st Sess. 6–7, reprinted in 1984 U.S.C.C.A.N. 3185–3188.

7. *Id.* at 3185.

the Bail Reform Act of 1984 fall within that carefully limited exception. The Act authorizes the detention prior to trial of arrestees charged with serious felonies who are found after an adversary hearing to pose a threat to the safety of individuals or to the community which no condition of release can dispel.

*Id.* at 755, 107 S.Ct. at 2105.

The issue presented here is whether defendants are, as the government argues, members of that small group of individuals who are not entitled to pretrial release under the Act.

### B. Procedure under the Act

■ Consistent with the intent expressed in the legislative history, the statutory scheme of the Bail Reform Act favors release over pretrial detention. The Act requires pretrial release under the least restrictive condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of the community. 18 U.S.C. § 3142(b). *United States v. Motamedi,* 767 F.2d 1403, 1405 (9th Cir.1985). Section 3142(a) provides four alternatives from which the judicial officer must choose:

(1) release on personal recognizance or unsecured appearance bond;

(2) release subject to certain conditions;

(3) temporary detention to permit revocation of conditional release, deportation, or exclusion; or

(4) pretrial detention.

Before a judicial officer may move from (1) to (2), there must be a determination that release on the less restrictive level "will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b) and (c). Before considering detention under (4), the judicial officer must first consider whether there are any conditions or combination of conditions which "will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c). The Act sets forth a number of conditions to be considered, including:

● third-party custody;

● employment or educational requirements;

● restrictions on personal associations, place of abode or travel;

● restrictions on contact with alleged victims or potential witnesses;

● supervision by the Pretrial Services Office, including reporting requirements;

● imposition of a curfew;

● prohibition against possessing a firearm, destructive device, or other dangerous weapon;

● restrictions on alcohol or narcotic use;

● medical, psychological, or psychiatric treatment, including residence in any treatment facility;

● execution of a property bond or posting of other security;

● return to custody for specified hours following release for employment, schooling, or other limited purposes;

● and "any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community."

18 U.S.C. § 3142(c)(B).

■ "The wide range of restrictions available ensures, as Congress intended, that very few defendants will be subject to pretrial detention." *Orta, supra,* 760 F.2d at 891 (8th Cir.1985).

■ The Act limits the kinds of cases in which pretrial detention is available. Thus, in some cases, release will be mandated *despite* the fact that it will endanger an individual or the community, or present a probability of non-appearance. Detention can be ordered only in cases involving one or more of the six circumstances listed in § 3142(f)(1) and (2). *United States v. Byrd,* 969 F.2d 106, 109 (5th Cir.1992). Section 3142(f) provides:

(f) **Detention hearing.**—The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appear-

ance of the person as required and the safety of any other person and the community—

(1) upon motion of the attorney for the Government, in a case that involves—

(A) a crime of violence;

(B) an offense for which a maximum sentence is life imprisonment or death;

(C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.) or the Maritime Drug Law Enforcement Act (46 U.S.C.App.1902 et seq.) or the Maritime Drug Law Enforcement Act (46 U.S.C.App.1901 et seq.); or

(D) any felony if the person has been convicted of two or more offenses described in subparagraphs (A) through (C) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (A) through (C) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; or

(2) Upon motion of the attorney for the Government or upon the judicial officer's own motion, in a case that involves—

(A) a serious risk that the person will flee; or

(B) a serious risk that the person will obstruct or attempt to obstruct justice, or threaten, injure or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

In the instant case, a crime of violence is involved. There is no dispute, therefore, that pretrial detention is available under the Act in connection with the crimes charged.

The factors to be considered in determining whether successful release conditions can be imposed are contained in § 3142(g):

(1) the nature and circumstances of the offense charged, including whether the of-

fense is a crime of violence or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

■ Although the Act permits the court to consider the nature of the offense and the evidence of guilt, it neither requires nor permits a pretrial determination of guilt; otherwise, "the refusal to grant release could become in substance a matter of punishment." *Motamedi, supra,* 767 F.2d 1403, 1408 (9th Cir.1985).

In the Ninth Circuit, the weight of the evidence is the least important of the factors. *Id; United States v. Honeyman,* 470 F.2d 473, 474 (9th Cir.1972); *United States v. Gebro,* 948 F.2d 1118 (9th Cir.1991). *See also United States v. Edson,* 487 F.2d 370, 372 (1st Cir.1973).

### C. Presumptions Against Release

■ Although the government argued at the August 22 detention hearing that there is a statutory presumption against defendants' release, this is not the case.[8]

The Act imposes a presumption against pretrial release in certain designated cases. The cases fall into two general categories. The first category involves offenders charged

8. Tr. 8/22/97, p. 13, lines 16–23.

with serious crimes who *previously* committed a serious crime while on pretrial release. *See* 18 U.S.C. § 3142(e)(1), (2) and (3). This type of presumption does not apply to either Barnett or Drake since neither defendant has a criminal record.[9] The second category involves offenders charged with one of the following particular offenses:

- a drug offense for which a maximum term of imprisonment of ten years or more is prescribed in one of the following statutes:
 — the Controlled Substances Act (21 U.S.C. 801 et seq.),
 — the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or
 — the Maritime Drug Law Enforcement Act (46 U.S.C.App.1901 et seq.),
- an offense under § 924(c) (using or carrying a firearm during a crime of violence or a drug trafficking offense);
- an offense under § 956(a) (conspiracy by one inside the United States to commit murder, kidnaping, or maiming at any place outside the United States);
- an offense under § 2332b (acts of terrorism transcending national boundaries).

18 U.S.C. § 3142(e).

This second category of cases also does not apply to the defendants, since they are not charged with any of the cited offenses.

The legislative history of the Act shows that Congress had reason to require different treatment of persons accused of drug offenses:

> * * * It is well known that drug trafficking is carried on to an unusual degree by persons engaged in continuing patterns of criminal activity. Persons charged with major drug felonies are often in the business of importing and distributing dangerous drugs, and thus, because of the nature of the criminal activity with which they are charged, they pose a significant risk of pretrial recidivism.

S. REP. No. 225, 98TH CONG., 2D SESS. 20, reprinted in 1984 U.S.C.C.A.N. 3182, 3203.

Congress did not restrict the presumption against release, however, to drug offenders. As noted above, Congress found several other types of crimes particularly heinous and grounds for concern regarding pretrial release. However, Congress did not include among them conspiracy to commit murder for hire or interstate travel with intent that murder for hire be committed—the crimes charged here. Consequently, the court is required to apply the factors in § 3142(g) without inclusion of any presumption against release.

### D. The Act Favors Pretrial Release

In *Byrd*, the Fifth Circuit reversed this court's order detaining a pedophile considered dangerous to children, and remanded with instructions to release the defendant on conditions of release. The appeals court did not dispute that the defendant presented a danger to children. Rather, it found that the charge (receiving child pornography in the mail) did not fall within one of the six circumstances prescribed by the Act. The court found that detention was not authorized under the Act, despite the fact that Byrd's release would jeopardize the safety of children upon his release. The court held:

> * * * There can be no doubt that this Act clearly favors nondetention. It is not surprising that detention can be ordered only after a hearing; due process requires as much. What may be surprising is the conclusion that even after a hearing, detention can be ordered only in certain designated and limited circumstances, irrespective of whether the defendant's release may jeopardize public safety.

---

9. The Order of Detention entered by Magistrate Judge Tynes as to Drake is ambiguous as to whether a presumption against release was found. The Order is set forth on a form AO 472 which contains boxes to be checked if either of the presumptions against release is found. Under "Part I—Findings of Fact," Judge Tynes checked off the boxes indicating that a presumption had been found under this part of the Act as a "crime of violence." However, no finding is indicated that Drake had a previous federal or state offense as required to trigger this presumption. Because Drake has no criminal record, and Judge Tynes made no mention of it in her oral remarks or written findings, I conclude that the checked boxes were simply an oversight.

*Byrd,* 969 F.2d at 109–10. The court therefore vacated the detention order entered by the district court.

■ Unlike *Byrd,* this case clearly involves a "crime of violence" within the meaning of 18 U.S.C. § 3142(f)(1)(A). A "crime of violence" is "an offense that has as one of its elements the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. Section 3156(a)(4)(A). Therefore, this court has authority to detain the defendants if it concludes that no conditions of release will reasonably assure their appearance and the safety of the community. However, as *Byrd* pointed out, the Act allows pretrial detention only in a narrow range of circumstances, consistent with constitutional guarantees. "Due to weighty liberty interests, the typical pretrial detainee is rarely detained prior to trial." *Hamilton v. Lyons,* 74 F.3d 99, 105 (5th Cir.1996) (citing *Salerno supra,* 481 U.S. 739, 754, 107 S.Ct. 2095, 2105).

■ Release should be denied only in rare circumstances, and doubts regarding the propriety of release should be resolved in the defendant's favor. *Sellers v. United States,* 89 S.Ct. 36, 38–39, 21 L.Ed.2d 64 (1968) (Black, J., in chambers); *Gebro, supra,* 948 F.2d 1118 (9th Cir.1991); *United States v. Motamedi,* 767 F.2d 1403 (9th Cir.1985); *Herzog v. United States,* 75 S.Ct. 349, 351, 99 L.Ed. 1299 (1955) (Douglas, J., in chambers); *United States v. McGill,* 604 F.2d 1252, 1255 (9th Cir.1979), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 708, 62 L.Ed.2d 671 (1980). This is particularly true in cases where no statutory presumption against release exists. *United States v. Flores,* 856 F.Supp. 1400, 1402 (E.D.Cal.1994).

■ The command of the Eighth Amendment that 'Excessive bail shall not be required * * *' obligates judges to deny bail only for the strongest of reasons. *Id., citing Truong Dinh Hung. v. United States,* 439 U.S. 1326, 1329, 99 S.Ct. 16, 18, 58 L.Ed.2d 33 (1978) (Brennan, J., in chambers). Federal law has traditionally provided that a person arrested for a noncapital offense shall be admitted to bail. *Stack v. Boyle,* 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed. 3 (1951); *United States v. Honeyman,* 470 F.2d 473, 474 (9th Cir.1972).

With these precepts in mind, I now turn to the particular facts and legal issues presented.

## 4. Findings of Fact and Conclusions of Law

### A. Background: Richard D. Barnett

Barnett is 51 years old and holds a B.S. in Petroleum Engineering from the University of Southwestern Louisiana (USL). He has worked for the past twenty years as a petroleum engineer and an engineering consultant. He spent one year as an instructor teaching Advanced Petroleum Engineering classes at USL. Barnett has published numerous technical manuals on plate tectonics and deep well drilling, and was recently working on a patent application through his company, Mitchell Trading Co.[10] Barnett has no criminal record and has heretofore been a law-abiding, productive member of society.

Barnett resided in the Lafayette, Louisiana community for over 25 years, until he relocated to Houston four years ago. He has an apartment in Houston, but in recent years has worked predominately in other countries as a consultant and a teacher, including China, Spain, Pakistan, Italy, France, Netherlands, Mexico, Guatemala, Belize, and Trinidad.[11]

Barnett has been married to Kay Lewis Barnett for 29 years. Mrs. Barnett is the office manager for a CPA firm in Lafayette. The couple have four children and one grandchild, all of whom live in Lafayette. Two of the children are minors (ages 16 and 14) who live with their mother.

Barnett and his wife have been physically separated for the past several years, al-

---

**10.** Pretrial Services Report dated August 6, 1997, and testimony at August 27 detention hearing.

**11.** Pretrial Services Report. Barnett's wife, Kay Lewis Barnett, testified that The National Republic of China invited Barnett to give a series of lectures to their drilling personnel, and that Barnett's work on drilling practices is being studied by a school in Copenhagen. Tr. 8/21/97, p. 25

though they remain friends and have no plans to divorce.[12] Despite his relocation, Barnett continues to spend approximately 15% of his time in the Lafayette community, and maintains close contact with his children via telephone calls and extended vacations together. Barnett spent six weeks vacationing this summer with his two youngest children.[13] Mrs. Barnett testified that she is willing to serve as a third-party custodian and will allow Barnett to reside in her home while he is on pretrial release.

Barnett's personal history and characteristics weigh in favor of pretrial release. While the government contends that Barnett no longer has strong ties to this community, this is refuted by the evidence summarized above. In addition, approximately fifteen to twenty members of the community appeared at Barnett's August 21 hearing, indicating that he retains strong ties to this community.[14]

Barnett is close to his mother, Margie Barnett Enis, as well as his seven siblings. Barnett's mother is 87 years old. She testified to her close relationship with all eight of her children, including the defendant. She is willing to put up the mobile home in which she resides in Dubac, Louisiana as security for an Appearance and Compliance Bond.[15] The mobile home is unencumbered and has a value of approximately $30,000.

Barnett's sister and brother-in-law, Dinah and Jerry Brazzel, are willing to put up their home and the 2 1/2 acre tract of land on which it (and Mrs. Enis' mobile home) are situated to secure Barnett's Appearance and Compliance Bond. The unencumbered value of the improved tract is approximately $100,-000.[16] Mrs. Brazzel testified at the detention hearing that she and her husband have full faith that Barnett will comply with all conditions of release. They understand the serious nature of the commitment they are making.

In addition to assets belonging to family members, counsel for Barnett provided the court with a list of all assets owned by Barnett which can also be posted as security for the bond. In addition to assets totaling approximately $69,030.59, Barnett is the sole stockholder of Mitchell Trading Co., a Texas corporation. Counsel proposed that Barnett execute a power of attorney in favor of his wife or his sister, directing that Barnett's posted assets be forfeited and surrendered in the event the court finds Barnett has violated a material condition of release or has failed to appear.

## B. Background: Virgil R. Drake

Drake is 61 years of age and has resided in the Lafayette area for 38 years. He and his wife Carole have been married for 40 years and have three grown children. Two of the children reside in Lafayette and one resides in Baton Rouge. Drake's mother, age 78, resides in DeQuincy, La., and he has three siblings who reside in Texas and Oklahoma. Drake has no criminal history.

Drake studied petroleum engineering for three years in college and has worked in the past as a well tester and an equipment operator. Drake's work in the oil field took him to Iran and South America in the 1970's. Drake was also employed at one time as a Louisiana State Trooper, although the time and duration of this employment was not placed in the record. Since 1990, Drake has been employed as a Conservation Enforcement Agent with the Louisiana Department of Natural Resources.

12. Barnett told the Pretrial Services Officer that he and his wife had been physically separated for four years. Mrs. Barnett also testified at the August 21 hearing that they had been physically separated for four years. However, at the August 27 hearing, she testified that although her husband began to travel extensively three or four years ago, they remained married in both "form and substance" until about a year ago. She testified that they remain good friends and she has no plans to file for divorce. Tr. 8/27/97, p. 20–27. Tr. 8/21/97, p. 23.

13. Testimony of Kay Lewis Barnett, Tr. 8/27/97, p. 27, lines 20–25.

14. Tr. 8/21/97, p. 24, lines 16–25.

15. See discussion at p. 36 infra.

16. Tr. 9/2/97 at p. 11.

In January 1986, Drake was involved in an automobile accident and suffered a blood clot to the brain which required surgery. For approximately two years, Drake was "not in touch with reality" and was under treatment by a neurologist. As a result of this injury, Drake occasionally suffers seizures for which he takes anti-convulsive medication. He also has sleep apnea and occasionally suffers periods of amnesia.[17] No issue of Drake's competency was raised at the detention hearings, however, and the medical information provided was not a factor in my bail determination.

Drake and his wife are willing to post their home as security for the appearance and compliance bond. Evidence at the August 27 hearing indicated that the home is valued at approximately $88,727, and there is an outstanding mortgage in the amount of $38,750.49. The equity in the home is therefore approximately $49,976.51.

The Drakes also own a rural lot in Beauregard Parish valued at approximately $25,000, with no outstanding mortgage. This property will also be posted as security.

Finally, Drake's son is willing to post his Baton Rouge home as security for the bond. The home was recently purchased and there is little equity in it—approximately $5,000 to $6,000. However, this represents the son's full interest in the home, and a bond violation by Drake would result in a loss of the home.

## C. Authority to Hold a Second Detention Hearing on Drake

The government challenges the court's authority to re-open Drake's bond status because Magistrate Judge Tynes previously ordered detention. This contention is without merit.

Drake came before Magistrate Judge Tynes on an arrest warrant in connection with a criminal complaint which charged a conspiracy to commit murder for hire (Rec. Doc. 4). Drake came before me on a summons after issuance of a subsequent indictment (Rec.Doc. 14). The indictment contains two counts: the conspiracy charge as well as a substantive charge of interstate travel with the intent to commit murder for hire under

18 U.S.C. § 1958. The complaint and the indictment are separate charging documents and are different in material respects.

Rule 5 F.R.Cr.P. requires that "[w]hen a person, arrested with or without a warrant or given a summons, appears initially before the magistrate judge ..." the magistrate judge is to advise the defendant of the charges, of his right to remain silent, and of his right to counsel. In addition, the magistrate judge "shall detain or conditionally release the defendant as provided by statute or in these rules." Rule 5(c) F.R.Cr.P.

 The plain words of Rule 5 require an initial appearance—and a concomitant bail consideration—with respect to each charging document. The government offers no authority for its position otherwise.

In a case on point, another court rejected the government's argument that it was unnecessary to hold a separate bail determination after issuance of an indictment:

> The government contends that a separate determination under Section 3141 et seq. is unnecessary because the order to detain "prior to trial" covers the indictment issued after the criminal complaint. The position of the government does not have express support in the statute, nor has this judge been able to discover any case law which supports such a position. Therefore, in the interest of providing the most comprehensive protection of the defendant's due process rights a distinct detention hearing based on the indictment was conducted on January 22, 1987.

*United States v. Leibowitz,* 652 F.Supp. 591, 592 (N.D.Ind.1987).

I conclude that an independent bail determination on the indictment was proper under these circumstances.

## D. "Prejudgment Argument"

 At Drake's detention hearing, the government argued that detention of the defendants should be ordered because the issue had been "prejudged" by Magistrate Judge Tynes and by two Pretrial Services Officers: the one in Houston who recommended deten-

---

**17.** Addendum to Pretrial Services Report dated August 23, 1997.

tion of Barnett, and the local one who recommended detention of Drake. I will first address the detention order of Magistrate Judge Tynes.

The bail proceeding before Magistrate Judge Tynes differed in material respects from the one held before the undersigned. Only two witnesses testified at the hearing before Magistrate Judge Tynes: the FBI case agent, Jean B. St. Pierre, Jr. and Marc Coleman, the pretrial services officer.

At the hearings before the undersigned, five witnesses testified: FBI Agent Garland Jean–Batiste, who had worked undercover as the second "hit man"; Midge Parker, wife of Ernest Parker, one of the purported targets of the murder for hire scheme; Marc D. Coleman, the probation officer; Carole Drake, the defendant's wife; and John Edward Caldwell, Jr., defendant's supervisor at the Louisiana Department of Natural Resources.

In addition, I listened to several of the government's tapes of the transactions in question, which were key to my determination regarding the nature of Drake's involvement in the crimes charged.

The evidence presented to me was much more comprehensive than that presented to Magistrate Judge Tynes. In particular, Judge Tynes did not have the benefit of listening to the government's tapes and hearing the testimony of FBI Agent Batiste that Drake was a reluctant participant in the alleged scheme. This information directly lowers the court's assessment of "the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release." 18 U.S.C. § 3142(g)(4). Furthermore, Judge Tynes did not have an opportunity to hear the testimony of Mrs. Drake regarding her husband's non-violent history and personality, and her willingness to serve as a third-party custodian and to post their home as security for a bond.

Under the circumstances, it is not surprising that Judge Tynes and I reached different conclusions on pretrial release of Drake. Of note is Judge Tynes' own statement suggesting that there might be more to the issue than was put before her. She stated, "If further evidence should come out that is new that hasn't been brought to my attention, the statute provides the defendant can file a Motion for Reconsideration of this bail determination." [18]

A bail determination under the Act is intensely fact-driven. The record shows that the parties failed to provide Magistrate Judge Tynes with the detail and range of information which was provided to me. I therefore conclude that the government's reliance upon the previous detention order is misplaced.

 Turning to the recommendations of the two Probation Officers, such recommendations are not meant to represent an analysis under the Bail Reform Act. They are intended only to aid the court in its determination of certain factors highlighted by the Act.

Probation Officer Marc Coleman acknowledged at the August 27 detention hearing that the charges in question carry only maximum penalties of up to five and ten years respectively. He also testified that Drake had an unblemished personal history. He admitted that his recommendation of detention was almost exclusively based upon the nature of the crime charged. While he did not believe there was a statutory presumption against Drake's release, he felt that "perhaps the Congress may have let this slip by." [19]

The point needs no elaboration that the court's duty is to apply the law as it is written by Congress. The information provided by both probation officers was certainly helpful to the court in its underlying factual determinations. However, the recommendation of the Probation Office is just that: a non-binding recommendation. The ultimate bail decision lies with the court, after careful consideration of the facts and the law.

18. Tr. 8/12/97, p. 17–18.

19. Tr. 8/27/97 at p. 81, line 11–12.

## E. *The Issue of Danger*

### (1) Drake is not a danger

█ It should first be noted that the government does not contend that Drake is a flight risk. Detention is sought solely on the ground that no conditions of release can reasonably assure the safety of Parker, Nichols, FBI Agent Batiste, and the Belize CI. This contention must be supported by "clear and convincing evidence." 18 U.S.C. § 3142(f).

The government presented no evidence that Drake has any personal motive or vendetta against the purported victims in this case. To the contrary, Agent Batiste, the undercover FBI agent who posed as the second "hit man" testified that Drake was a facilitator to Barnett. Drake delivered a package of information to the CIs, and he drove them hurriedly past Ernest Parker's home. Throughout, he was extremely nervous. Agent Batiste admitted that Drake appeared to be a reluctant participant in the scheme.[20] This is corroborated by the government's tapes, which contain a conversation in which the two "hit men" tell Barnett that Drake was behaving as if he were the target of the hit.

The wife of one of the purported targets, Midge Parker, testified that she had never met Drake before and knew nothing about him except what she had read in the paper. No evidence was presented of a relationship between Drake and either of the victims. Evidence also shows that the Belize CI is not in the country. Thus, Drake's release does not pose a danger to him.

Under these circumstances, there is no basis to conclude that Drake poses a danger to any person or the community. The court can obviate any lingering concerns by imposing stringent release conditions tied to a bond secured by Drake's home, the rural property he owns, and the home of his son. The bond will be forfeitable upon violation of any condition of release.

### (2) "Reasonable Assurance" of Safety

█ The issue of Barnett's release is a closer question. Evidence shows that Barnett was the moving force behind the alleged

scheme, and that Barnett had a personal motive. Consequently, Barnett's release poses more danger than Drake's. However, the ultimate question remains the same: are there conditions of release which can reasonably assure the safety of the purported victims and the witnesses?

Judge Keeton of the District of Massachusetts posed another pertinent question: "What degree of risk, taking account of both severity of harms and probability of occurrence, is enough to constitute 'danger' in the statutory sense?" He answered the question as follows:

> The Bail Reform Act does not provide a specific, bright-line answer to this question. Instead, it prescribes a standard—"reasonably assure safety"—that requires the judicial officer to make an evaluative, judgmental determination. In using the word "danger" and phrases such as "reasonably assure safety,"

> Congress did not declare that the community is entitled to assurances of freedom from all harm, and a court cannot detain arrestees on the mere apprehension of danger of harm. Rather, the court's inquiry must focus on whether by conditions of release the community can *reasonably* be assured of safety.

[*United States v. Phillips,* 732 F.Supp. 255, 266 (D.Mass.1990).] The judicial officer's principal sources of guidance for understanding this statutory standard are the congressional paradigms implicit in the presumptions regarding appearance and safety. They are explained as well in the legislative history * * *

*United States v. Shea,* 749 F.Supp. 1162, 1167 (D.Mass.1990).

In the instant case it is certainly within the wide realm of the possible that—for the chance to carry out a scheme of revenge—Barnett will disregard the conditions of release, forfeit all of his financial assets, render his 87–year old mother homeless, render his sister and brother-in-law homeless, and incur criminal penalties up to life in prison or the

**20.** Tr. 8/27/97, p. 65–66.

death penalty. However, I find this scenario implausible and unlikely.

 As much as it may be desirable to eliminate even this slight possibility of danger to the community, the law does not permit the court to require guarantees of safety before granting pretrial release. All that is allowed is a "reasonable assurance" of the safety of any person and the community. *United States v. Fortna,* 769 F.2d 243, 250 (5th Cir.1985) *citing Orta, supra,* 760 F.2d at 890–92 (8th Cir.1985).

In *Orta,* the district court found the defendant could not be released on conditions because "they cannot guarantee that defendant will not attempt to harm witnesses * * * or will not flee the jurisdiction * * *." *Id.* at 889. The Eighth Circuit reversed and remanded, noting that the Act does not mandate guarantees:

> In this case, the district court erred in interpreting the "reasonably assure" standard set forth in the statute as a requirement that release conditions "guarantee" community safety and the defendant's appearance. Such an interpretation contradicts both the framework and the intent of the pretrial release and detention provision of the 1984 Act. Congress envisioned the pretrial detention of only a fraction of accused individuals awaiting trial. The district court's interpretation, however, virtually mandates the detention of almost every pretrial defendant: no other safeguard can "guarantee" the avoidance of the statutory concerns. Further, the burden on the government in most cases to show a defendant's dangerousness and flight propensity would be lessened considerably if the government need only show by clear and convincing evidence that no release condition could "guarantee" the community's safety and by a preponderance of the evidence that no condition could "guarantee" a defendant's appearance. The structure of the statute mandates every form of release be considered before detention may be imposed. That structure cannot be altered by building a "guarantee" requirement atop the legal

criterion erected to evaluate release conditions in individual cases.

*Orta,* 760 F.2d at 891–92.

There is precedent in this Circuit for the pretrial release of a defendant charged with attempted murder-for-hire. In *United States v. Aron,* the defendant was charged with use of interstate commerce facilities in the course of a conspiracy to commit murder-for-hire, carrying a firearm in relation to a crime of violence, and mail fraud. 904 F.2d 221 (5th Cir.1990). The court denied the government's motion for detention, and released the defendant on a $100,000 bond. Although release was later revoked for a violation of conditions, the case demonstrates that the nature of the crime alone cannot be grounds for pretrial detention.

Considering the facts presented and the applicable law, I find that there are conditions of release which will more than "reasonably assure" the safety of the two purported victims and the government witnesses.

### (3) Objective Test of Danger

 The danger posed by a defendant's pretrial release must be judged by an objective standard, not a subjective one. *United States v. Tortora,* 922 F.2d 880 (1st Cir.1990); *United States v. Flores,* 856 F.Supp. 1400, 1402 (E.D.Cal.1994); *Orta, supra,* 760 F.2d at 892 (8th Cir.1985) ("We do not believe the 'reasonably assure' standard is an unduly difficult one to apply. The judicial officer cannot require more than an objectively reasonable assurance of community safety and the defendant's appearance at trial.")

At the August 27 detention hearing on Drake, the government asked Midge Parker, Ernest Parker's wife, what emotions she felt when she learned of the alleged murder-for-hire scheme. In response to an objection, the government argued that the witness was a victim, and therefore "entitled to address the Court ... relative to what impact the release of this man may have on her." [21] The government cited the Victim and Witness Protection Act in support of this argument, without elaboration. The government later argued that the perceptions of the intended victims were relevant to the court's determi-

---

21. Tr. 8/27/97 at p. 70, lines 5–23.

nation.[22] The government was in error.

Both the Victim and Witness Protection Act (VWPA) of 1982 and the Bail Reform Act of 1984 were products of a national grass roots movement popularly known as the Victim's Rights Movement.[23] The VWPA was passed two years before the Bail Reform Act, and thus has no effect upon the standards to be followed by the court in determining pretrial release.[24] Both Acts contained provisions to increase the role of victims in the criminal justice system. The Bail Reform Act did this by including danger to the community as one of the factors to be considered by the court. Still, danger to the community must be judged by an objective standard, not a subjective one.

 Testimony of a family member of an intended murder victim is relevant to a bail determination when the member has relevant information, e.g., bearing upon the motive of the defendant, the history of the relationship between the defendant and the victim, or statements made by the relevant parties. However, Mrs. Parker admitted that she knew nothing about Drake other than what she read in the paper, and had never met him. She was called solely to testify regarding her personal feelings and perceptions that her family would be endangered by the release of either defendant, regardless of the conditions imposed.[25]

The court is extremely conscious of the importance of the safety issues presented, and is sensitive to the feelings of fear and vulnerability which the Parkers and the Nichols must be experiencing. The concerns of these families are valid and understandable. The undersigned would not order re-lease if there was a reasonable possibility that either defendant would commit a crime while on release. The nature and amount of the bonds to be set, and the stringent conditions of release, will reasonably assure the compliance of the defendants.

### F. Is Barnett "Irrational?"

The government contends that Barnett should not be released because he still has a strong motive to harm Parker and Nichols, and will also likely try to harm the Belize CI and the undercover FBI agent involved in the investigation. The government argues that Barnett is "fueled by hate, vengeance and retribution" against Parker and Nichols, and that Barnett's thinking is "clouded." The government contends that Barnett cannot be motivated to comply with conditions of release because he doesn't think like a normal person; he is irrational.

The tapes I heard support the government's theory that Barnett has a long-standing hatred of Parker. On the tape marked "July 11, 1997," Barnett makes the statement that Parker "deserves to die." He indicates that he had tried once before to hire someone to harm or kill Parker, but the plan fell through. He states that at times he thinks he should just injure Parker, and at other times he thinks "dying" is the best thing. Barnett states he is "committed to getting it done" and that he just needs to "find the right guy." He states he has spent a lot of time thinking about it, and he knows how to build a silencer.

The recorded conversations establish that Barnett has, or at least had, a strong desire to see harm and even death come to his

---

22. Tr. 8/27/97 at p. 72, lines 15–17.

23. Karen L. Kennard, *The Victim's Veto: A Way to Increase Victim Impact on Criminal Case Dispositions*, 77 Calif.L.Rev.417, 422 (1989).

24. The major provisions of the VWPA were (1) to amend the Federal Rules of Criminal Procedure to require that federal judges be given a Victim Impact Statement prior to sentencing criminals; (2) to amend Title 18 of the U.S.Code to require restitution for crimes involving loss of property or personal injury; (3) to amend Title 28, the Federal Tort Claims Act, to make the federal government civilly liable for bodily injury caused by a "dangerous person" who has either escaped or been released from federal custody where the government is found to be "grossly negligent"; (4) to require the Attorney General to prepare guidelines for the fair treatment of victims of federal crimes; and (5) to require that the Attorney General recommend legislation requiring that restitution be made to the victim before a federal felon may profit from his crime's notoriety. S.Rep. No. 97–532, at 9–10 (1982).

25. The government was partially successful in this tactic; the local newspaper parlayed the testimony into a sensational and misleading headline which appeared the following day.

intended victims—particularly Parker. Although the government presented no evidence to explain Barnett's motive, I obtained and reviewed copies of two civil suits filed by Barnett against Parker and Nichols which have been widely discussed in the news media. The first suit was filed on November 22, 1991 by Barnett and his corporation, Marsh Engineering, Inc., against Parker and Nichols. It alleges that Parker fraudulently induced Barnett and his corporation to transfer to Parker a valuable 25% stock ownership in Campbell Wells, Inc. and a 25% interest in CAMCO–85, a partnership. At the time, Parker, Nichols, and a third investor, William C. Davis, also owned 25% shares along with Barnett.

The complaint alleges that Parker was Barnett's attorney at the time, that Barnett trusted Parker, and that Barnett transferred the property upon Parker's false representation that he would hold it in trust until some financial difficulties Barnett was experiencing could be worked out. Instead, Parker and Nichols allegedly converted the property into other valuable holdings and have refused to return Barnett's property to him or otherwise account for it.

Barnett filed a similar suit individually against Logan Nichols on December 16, 1996. The suit was based upon the same facts, and alleged that Nichols was aware of the fraudulent means used by Parker to obtain the property.

It appears that Barnett's motive, if any, emanates from these events, and that he bears an animosity toward Parker and Nichols. However, the government has failed to present any evidence that Barnett's negative feelings toward his purported victims cannot be counterbalanced by concern for his family and their property, concern for his own financial welfare, and awareness of the huge disparity in criminal penalties between the charges he faces and the charges he might face if he injures the purported victims while on release.

Just as a person may be motivated by hate, he can also be motivated by love, friendship, loyalty, fear, and self-interest. These are the principles upon which the Bail Reform Act are based: that most people can

be released on some combination of bond conditions which will insure the safety of the community and their appearance at trial.

The concept of criminal motive is based upon the theory that rational people may be motivated to do things by a variety of emotions. When people are motivated to do good things at their own personal expense, we do not say they are irrational. Likewise, when people do illegal or immoral things out of hate or desire for revenge, they are not necessarily irrational or insane.

As mentioned, one of the obvious disincentives for the defendant to carry through any plan he may have had to harm the intended victims is the effect on the criminal penalties he is facing. The Probation Office, at my request, did a rough calculation of the Sentencing Guidelines which would apply to the current charges. If the defendants plead guilty to both counts, the sentencing range would be roughly between 7.25 and 8.75 years.

If the defendants were to retaliate against a government witness, including Parker and Nichols in this case, they would face a **possible sentence of death or life imprisonment** under 18 U.S.C. § 1513, if the person involved is killed in a premeditated fashion. In the case of an attempt to kill someone, the maximum penalty is twenty years imprisonment under § 1513.

Likewise, under state law, second degree murder carries a mandatory sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La.R.S. 14:30.1(B).

The cited penalties are substantially more serious than those the defendants are currently facing. I conclude that the likelihood that either defendant will risk exposure to these penalties is extremely minute. Furthermore, the chance that these defendants could get away with any form of physical attack—direct or indirect—upon the purported victims or witnesses in this case is nonexistent. This case has generated sensational headlines and much publicity. One of the purported victims, Parker, is a co-owner of the popular Ice Gators ice hockey team. Defendants would indeed have to be irrational

to attempt anything while on pretrial release. The government has offered no evidence that either defendant suffers from a mental disease or defect which would impede their ability to rationally consider these consequences.

 To detain a defendant prior to trial, the court must find by "clear and convincing evidence" that "there is no condition or combination of conditions which will reasonably assure the safety of any other person and the community." 18 U.S.C. § 3142(e). "Clear and convincing evidence" is more than a preponderance of the evidence and less than "beyond a reasonable doubt." *United States v. Chimurenga,* 760 F.2d 400 (2nd Cir.1985). "To find danger to the community under this standard of proof requires that the evidence support such a conclusion with a high degree of certainty." *Id.*

Considering the testimony and other evidence presented, I conclude that the government has failed to prove by clear and convincing evidence that there are no conditions of release which will reasonably assure Barnett's appearance and the safety of the purported victims, the CIs and the community.

### G. Authority for Appearance/Compliance Bond

 Under the Bail Reform Act, bond forfeiture is limited to instances of non-appearance. Title 18 U.S.C. § 3146(d). Under the Act, the court has only two remedies when a defendant violates a condition of his release short of non-appearance: (1) revocation of release and entry of an order of detention; and (2) prosecution for contempt of court. See 18 U.S.C. § 3148.

There is authority outside of the Bail Reform Act, however, for the forfeiture of posted security as a consequence of any violation of a bond condition. Rule 46(e)(1) of the Federal Rules of Criminal Procedure states: "If there is a breach of condition of a bond, the district court shall declare a forfeiture of the bail." Citing Rule 46(e), the Fifth Circuit has twice allowed bond forfeiture for a violation of travel restrictions. *United States v. Dunn,* 781 F.2d 447 (5th Cir.1986); *Brown v. United States,* 410 F.2d 212, 218 (5th Cir.),

*cert. denied,* 396 U.S. 932, 90 S.Ct. 272, 24 L.Ed.2d 230 (1969). *Brown* held that a court can forfeit a bond under Rule 46(e) regardless of the provisions of the Bail Reform Act, as long as the condition was explicitly made a part of the bond.

In a more recent case, the Tenth Circuit noted that a court can incorporate the Order Setting Conditions of Release (AO Form 199A) into the Appearance Bond (AO Form 98) so that violation of a release condition results in bond forfeiture. *United States v. Dudley,* 62 F.3d 1275, 1278 (10th Cir.1995). Because the lower court had not incorporated the two forms, forfeiture in that case was not authorized. However the court noted that an appearance bond is a contract and that "the bond **could be** conditioned on the same factors as contained in the order setting conditions of release." *Id.* (emphasis supplied). The court cites the *Brown* case as well as several other cases as authority.

Considering the foregoing authorities, I have modified AO Form 98 ("Appearance Bond") into an "Appearance and Compliance Bond" which by its own terms incorporates the stringent conditions of release and authorizes bond forfeiture for a violation of any release condition.

### 5. Order Setting Conditions of Release as to each defendant

#### A. Barnett

 It is hereby ORDERED that Barnett may secure his release under the following conditions:

1. Barnett and his sureties shall execute an Appearance and Compliance Bond in the amount of $500,000.

2. The bond sureties shall include Barnett's wife, Kay Lewis Barnett; his mother, Margie Barnett Enis; his sister Dinah Brazzel, and Mrs. Brazzel's husband.

3. The bond shall be secured by the full unencumbered value of the mobile home owned by Mrs. Enis (approximately $30,000); by the full unencumbered value of Mr. and Mrs. Brazzel's home and the 2 1/2 acre tract of land on which it sits (along with Mrs. Enis'

mobile home) (approximate value $100,000); and by Barnett's own assets as listed in the letter of counsel dated August 28, 1997 and filed with the Clerk, such assets totaling approximately $69,030.59. In addition, Barnett shall post as security all stock holdings in Mitchell Trading Co.

4. Barnett shall execute a power of attorney in favor of his sister, Dinah Brazzel, which shall expressly direct and authorize Mrs. Brazzel to forfeit and surrender all assets owned by Barnett which are posted as bond security in the event the court finds Barnett has violated a material condition of release or has failed to appear.

5. The Appearance and Compliance Bond will provide that forfeiture of the posted securities will occur if Barnett fails to appear as ordered, or fails to comply with a condition of release as set forth in the Order Setting Conditions of Release (AO Form 199A);

6. Defendant and his wife, as third party custodian, shall sign an "Order Setting Conditions of Release" (AO199A), the terms of which will be incorporated into the Appearance and Compliance Bond. The specific conditions of release to be imposed in the "Order Setting Conditions of Release" are as follows:

a. Defendant will be placed into the third-party custody of his wife, Kay Lewis Barnett, who will be responsible for supervising the defendant in accordance with all conditions of his release, using every effort to assure his appearance, and notifying the court immediately in the event he violates any release condition or disappears;

b. The defendant shall maintain or actively seek employment;

c. The defendant shall restrict his travel to Lafayette Parish;

d. The defendant shall avoid all contact with the following individuals or their families: Ernest Parker, Logan Nichols, Virgil R. Drake, the FBI agents involved, and the confidential source;

e. The defendant shall report on a regular basis to the Probation Office as directed;

f. The defendant shall comply with a curfew from 6:00 p.m. to 7:00 a.m., which may be electronically monitored by the Probation Office.

g. The defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapon;

h. The defendant shall refrain from excessive use of alcohol, and any use or unlawful possession of a narcotic drug and other controlled substances defined in 21 U.S.C. § 802 unless prescribed by a licensed medical practitioner;

i. The defendant shall obtain no passport and shall surrender any current passport to the Clerk of Court.

### B. Drake

The conditions of release previously set forth herein will remain in effect for Drake. (See pp. 390–391 *supra* ).

### C. Bond Forms

To assist the court on review, I have attached hereto the bond documents which must be executed by the defendants.* Other legal documents will be required to secure the real and personal property to the bond documents. Counsel has already been furnished with the list of items required for securing the real property.

### 6. Order of Stay

This ruling is hereby STAYED pending review by the district judge under 18 U.S.C. § 3145(a). In the event no request for review is filed within ten days of this date, this order shall be effective and defendants may be released after execution of the necessary documents.

* Editor's Note: Attachments deleted for purposes of publication.

IT IS FURTHER ORDERED that the Clerk shall FAX a copy of this ruling to all counsel of record.