UNITED STATES of America

v.

**Robert Allen STANFORD, a/k/a
Sir Allen Stanford a/k/a
Allen Stanford.**

**Criminal Action No. H–09–342.**

United States District Court,
S.D. Texas,
Houston Division.

June 30, 2009.

Gregg Costa, Office of the U.S. Attorney, Houston, TX, Paul Pelletier, Jackie B. Patrick, United States Department of Justice, Washington, DC, for United States of America.

Dick DeGuerin, Sean Buckley, DeGuerin & Dickson, Houston, TX, for Defendant Robert Allen Stanford.

## ORDER

DAVID HITTNER, District Judge.

Pending before the Court is United States of America's Motion for Revocation of Release Order. Having considered the motion, evidence, testimony and oral argument presented during a hearing held on June 29, 2009, and the applicable law, the Court determines the motion should be granted. Accordingly, the Court now enters the following findings of fact and conclusions of law. Any finding of fact that should be construed as a conclusion of law is hereby adopted as such. Any conclusion of law that should be construed as a finding of fact is hereby adopted as such.

## INTRODUCTION

On June 18, 2009, a federal grand jury in Houston, Texas returned a twenty-one count indictment against Defendant Robert Allen Stanford ("Stanford"), Chairman of the Board of Directors of Stanford International Bank, Ltd. ("SIBL"), and four codefendants. The indictment alleges that Stanford, in controlling Stanford Financial Group ("SFG") and its affiliated companies—including SIBL, conspired to commit and did commit mail fraud and wire fraud, conspired to commit securities fraud and money laundering, and conspired to obstruct and did obstruct a Securities Exchange Commission ("SEC") investigation.

On June 25, 2009, United States Magistrate Judge Frances Stacy held a detention hearing at which witnesses testified and evidence was received. Judge Stacy specifically found "that there is a risk of flight for Mr. Stanford" but then granted bond of $500,000 with a $100,000 cash deposit.[1] The United States of America ("Government") moved to stay Magistrate Judge Stacy's release order, and this Court granted the motion. The Government then moved this Court to revoke Magistrate Stacy's release order and order Stanford detained pending trial.

On June 29, 2009, the Court held a hearing on the Government's motion to revoke the release order. At the hearing, the Court received evidence, including the complete transcript of the magistrate judge's detention hearing, and heard argument from counsel.

## FINDINGS OF FACT

1. Stanford is a citizen of both the United States of America and the country of Antigua and Barbuda.[2]

2. In September 2008, *Forbes* magazine listed Stanford as the 205th wealthiest American with a net worth of over $2 billion.

3. Stanford has lived primarily outside of the United States for at least the last fifteen (15) years prior to the

---

1. *See* Transcript of Detention Hearing at 207, *United States v. Robert Allen Stanford,* Crim. No. 4:09–cr–342 (Document No. 46).

2. Stanford is also referred to as Sir Allen Stanford because he was knighted by the country of Antigua and Barbuda.

February 2009 filing of SEC civil proceedings against him, *Securities & Exchange Commission v. Stanford International Bank, Ltd.*, No. 3:09–cv–298–N (N.D.Tex.), (the "SEC Action").

4. Forensic accountants working for the receiver ("Receiver") appointed in the SEC Action have been unable to account for approximately $1.1 billion in funds investors deposited, in the form of Certificates of Deposit, into SIBL.

5. An SFG bank account ("the Swiss bank account") existed at Societe Generale Bank in Switzerland, in which only Stanford and Chief Financial Officer Jim Davis ("Davis") maintained signatory authority. This account was allegedly unknown to Chief Investment Officer Laura Pendergest–Holt, who generally maintained signatory authority on other accounts that SFG and related entities held at Societe Generale. At a meeting with Stanford and Davis, Pendergest–Holt allegedly was directed to leave the room when Stanford and Davis began discussing the Swiss bank account.

6. The balance in the bank account decreased from approximately $120 million to approximately $20 million during the last two weeks of December 2008, about the time the SEC and other regulatory agencies began taking enforcement actions against SIBL.

7. In mid–2008, Stanford and Davis used the Swiss bank account to make monthly payments to their outside private auditor in amounts greater than the normal payments to those auditors, which were usually made from an established SIBL account. Stanford and Davis communicated the request for payment to Blaise Friedli, Executive Vice President of Private Banking at Societe Generale, who served on SFG's International Advisory Board.

8. In late 2008, the SEC issued a subpoena for Stanford to testify before the commission regarding the SEC investigation into SFG. On January 26, 2009, Stanford traveled from St. Croix, U.S. Virgin Islands to Tripoli, Libya and then on to Zurich, Switzerland, where he stayed until January 29, 2009. Stanford's pilot testified this was an unusually lengthy stay compared to Stanford's previous trips to Switzerland.

9. Moreover, Stanford engaged in routine, almost continual, international travel on the fleet of six private jets and one helicopter belonging to SFG and its related companies. Testimony indicates these flights were often scheduled at the last minute and steps were taken to conceal Stanford's whereabouts.

10. Further, Stanford's United States passport reveals his travel to more than thirty countries on five continents since 2005.

11. Between January 2004 and February 18, 2009, Stanford engaged in almost non-stop travel across the globe. *See* Government's Exhibit 14A.[3]

12. Stanford's U.S. passport shows multiple occasions in which there is an exit stamp for Antigua but no corresponding entry stamp, or an entry stamp with no corresponding exit stamp. *See* Government's Exhibit 14.

---

**3.** Government's Exhibit 14A is a spreadsheet containing Stanford's travel records between December 31, 2003 and February 18, 2009. It is forty-two (42) pages long, contains 2,127 separate line entries, and lists entry and exit into over thirty-one (31) countries, including, *inter alia*, Libya, Panama, Singapore, Malaysia, Colombia, Mexico, and Venezuela. Moreover, these entries demonstrate Stanford hopscotched the globe over this five-year period, remaining in one city or country for only extremely limited duration.

13. Stanford failed to disclose to Pretrial Services that he also possessed an Antiguan passport.

14. At the June 25, 2009 hearing before the magistrate judge, Stanford stated he did not know where his Antiguan passport currently was located. At the June 29 hearing, it was made clear to the Court that Stanford indeed possessed two Antiguan passports, one of which was expired. Also, at the June 29 hearing, Stanford surrendered one Antiguan passport to the Court, indicating that a friend of Stanford had retrieved the passport from Stanford's hangar apartment in Antigua in May.[4]

15. The whereabouts of the second, allegedly expired, Antiguan passport is unknown.

16. It is clear that Stanford has numerous international business contacts.

17. Moreover, Stanford's acquaintances have shown a willingness to provide him with financial support. For example, an individual Stanford had not met until April 2009 paid $36,000 for one year's rent for an apartment in Houston for Stanford to live in pending his trial.

18. Furthermore, the indictment alleges Stanford bribed Leroy King, Commission of the Antiguan Financial Services Regulatory Commission, to prevent detection of the alleged fraud.

19. The indictment charges counts with a total sentencing exposure of 375 years confinement. If convicted on all charges, the fraud amount alleged in the indictment would result in an advisory Sentencing Guideline range of life in prison.

*CONCLUSIONS OF LAW*

*A. Standard of Review*

20. The district court reviews a magistrate court's release order *de novo. See, e.g., United States v. Rueben,* 974 F.2d 580, 585–86 (5th Cir.1992), *cert. denied,* 507 U.S. 940, 113 S.Ct. 1336, 122 L.Ed.2d 720 (1993); *United States v. Gourley,* 936 F.Supp. 412, 415 (S.D.Tex. 1996).

21. Moreover, the district court "must make an independent determination of the proper pretrial detention or conditions of release." *Rueben,* 974 F.2d at 585–86.

22. It is well within the district court's discretion to determine the propriety of pretrial release. *See, e.g., United States v. Hare,* 873 F.2d 796, 798 (5th Cir.1989) ("Absent an error of law, we must uphold a district court's pretrial detention order 'if it is supported by the proceedings below'") (citing *United States v. Jackson,* 845 F.2d 1262, 1263 (5th Cir.1988)).

23. In determining whether there are conditions of release that will reasonably assure the defendant appears at trial, the court considers: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; and (3) the defendant's personal history and characteristics, including, *inter alia,* his length of residence in the community. 18 U.S.C. § 3142(g); *Rueben,* 974 F.2d at 586.

24. "For pretrial detention to be imposed on a defendant, the lack of reasonable assurance of either the defendant's

---

**4.** Moreover, it is unclear from the testimony or counsel argument whether Stanford also possesses a diplomatic passport issued by Antigua. The Court notes these inconsistencies in Stanford's statements regarding the Antiguan passports.

appearance, or the safety of others or the community, is sufficient; both are not required." *Rueben,* 974 F.2d at 586.

## B. Flight Risk

25. The Government contends Stanford is a serious flight risk.

26. The determination of whether a defendant poses a serious flight risk is made based on the preponderance of the evidence. *See, e.g., U.S. v. Fortna,* 769 F.2d 243, 250 (5th Cir.1985) ("[T]o order detention [based on flight risk] the judicial officer should determine, from the information before him, that it is more likely than not that no condition or combination of conditions will reasonably assure the accused's appearance.").

27. Furthermore, "[d]etention determinations must be made individually and, in the final analysis, must be based on the evidence which is before the court regarding the particular defendant." *United States v. Tortora,* 922 F.2d 880, 888 (1st Cir.1990); *United States v. Knight,* 636 F.Supp. 1462, 1467 (S.D.Fla.1986) ("Each case must be considered on its own merit.").[5]

## C. Nature and Circumstances of the Offenses Charged

28. Stanford is charged with twenty-one counts. If convicted on all twenty-one counts, he faces a daunting term of imprisonment of, up to, 375 months.

29. The severity of the potential sentence weighs heavily in favor of detention.

*See United States v. Almasri,* Crim. A. No. H–07–155, 2007 WL 2964780, at *1 (S.D.Tex. Oct. 10, 2007) (finding severity of potential ten-year sentences weighed in favor of detention).

## D. Weight of the Evidence

30. Secondly, the Court considers the weight of the evidence against the defendant. *See* 18 U.S.C. § 3142(g); *Rueben,* 974 F.2d at 586; *Almasri,* 2007 WL 2964780, at *1.

31. However, courts have found this factor to be of least importance in the detention determination. *See, e.g., United States v. Winsor,* 785 F.2d 755, 757 (9th Cir.1986); *United States v. Barnett,* 986 F.Supp. 385, 393 (W.D.La.1997).

32. The charges against Stanford are multiple and complex, and the Government argues the evidence is overwhelming. Stanford denies guilt and contends there is no evidence to support the charges against him.

33. However, the Government presented evidence that Stanford directed payments to be made from a bank account known only to himself and Davis, that $100 million was withdrawn from the bank account in late 2008 corresponding with the time frame the SEC began its inquiry into SFG, and that over $1 billion in SFG funds are still yet to be accounted for by the Receiver.

34. Moreover, Stanford concedes that SFG and its related entities conducted business around the globe in mul-

---

**5.** Stanford points to several other high-profile white-collar criminal cases in which defendants were granted pretrial release on various amounts of bond. The Court first notes that "[n]o two defendants are likely to have the same pedigree or to occupy the same position," and the Court's determination is a case-by-case, factual determination. *See Tortora,*

922 F.2d at 888; *Rueben,* 974 F.2d at 585–86. Moreover, each of the defendants in the cases Stanford cites were U.S. citizens and residents of the United States, whereas Stanford, although a U.S. citizen, is also a citizen of Antigua and Barbuda and resided in that island nation for at least the past fifteen years.

tiple countries, many of which have yet to be accessed by the Receiver.

35. In total, the evidence proffered by the Government is sufficient to weigh in favor of detention. *Cf. United States v. Minns*, 863 F.Supp. 360, 363–64 (N.D.Tex.1994).

*E. Personal History & Characteristics— Length of Residence in Community*

■ 36. A court will consider a defendant's ties to the community in determining whether the defendant proposes a serious flight risk. *See* 18 U.S.C. § 3142(g); *Rueben*, 974 F.2d at 586; *United States v. Trosper*, 809 F.2d 1107, 1110 (5th Cir.1987).

37. The ties to the locality, including family ties, must be the "sort of family ties from which we can infer that a defendant is so deeply committed and personally attached that he cannot be driven from it by the threat of a long prison sentence." *Rueben*, 974 F.2d at 586.

38. Moreover, the family ties must be the type of relationships that exert a level of control that would prevent the defendant from fleeing. *See Trosper*, 809 F.2d at 1110.

39. Here, the Government contends that Stanford has no longstanding family ties in Houston and that any residential ties to the area are illusory and made in order to secure pretrial release on bond.

40. Indeed, Stanford admits that, "Prior to his arrest, in 2009 Allen Stanford established a new residence in Houston *in preparation for his required presence during the pendency of this case.*" Allen Stanford's Second Memorandum in Support of His Right to Pretrial Release, at 11–12 (emphasis added).

41. Stanford's family ties to Houston are tenuous at best and of recent vintage.

It was only when it became clear that an indictment would be returned against him that he began making living arrangements in Houston. Although he claims his children are moving to Houston, that too is only due to Stanford's impending trial in Houston.

42. Furthermore, Stanford was in Virginia when the indictment was returned and was taken into custody in Virginia. Moreover, Stanford's longterm residence is Antigua and his frequent travels across the globe and to multiple foreign countries belie his contention that he has strong ties to Houston.

43. This factor weighs heavily in favor of detention. *See Rueben*, 974 F.2d at 586; *Trosper*, 809 F.2d at 1110; *see also U.S. v. Cisneros*, 328 F.3d 610, 618 (10th Cir.2003); *Almasri*, 2007 WL 2964780, at *2.

44. Taken together, Stanford's longstanding ties to a country other than the United States—Antigua and Barbuda, his primary residence for the past fifteen years, his access to an international network and financial resources, his familiarity with global travel, and the severity of the punishment he may be subjected to if convicted of the charges alleged in the indictment against him compel the Court's determination that Stanford poses a significant risk to flee the Court's jurisdiction prior to trial. *See Cisneros*, 328 F.3d at 618; *Minns*, 863 F.Supp. at 364; *Almasri*, 2007 WL 2964780, at *2.

*CONCLUSION*

45. For all the foregoing reasons, the Court determines that Stanford is a serious flight risk and there is no condition or combination of conditions

of pretrial release that will reasonably assure his appearance as required for trial. Accordingly, the Court hereby

ORDERS that United States of America's Motion for Revocation of Release ORDER is GRANTED. The Court further

ORDERS that United States Magistrate Judge Frances Stacy's release order issued on June 25, 2009 is hereby REVERSED. The Court further

ORDERS that Defendant Robert Allen Stanford is hereby COMMITTED TO THE CUSTODY of the ATTORNEY GENERAL or his designated representative to be DETAINED pending trial. The Court further

ORDERS that because the Defendant is detained pretrial, the Defendant shall be held in a corrections facility separate, to the extent practicable, from persons serving sentences or being held in custody pending appeal. The Defendant shall be afforded a reasonable opportunity to consult in private with his attorneys.